# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2019

_____

Andrew Ellis; Harriet A. Ellis

*Plaintiffs - Appellants*

v.

The City of Minneapolis, a municipal corporation; Betsy Hodges, individually and as Mayor of the City of Minneapolis; Nuria Rivera-Vandermyde, individually and as Director of Minneapolis' Department of Regulatory Services; JoAnn Velde, individually and as Deputy Director of City of Minneapolis' Department of Regulatory Services

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 8, 2017
Filed: June 27, 2017

_____

Before WOLLMAN, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Andrew and Harriet Ellis are for-profit, low-income rental housing providers in Minneapolis. The Ellises filed suit against the City of Minneapolis and city

officials (collectively, "the City"), alleging the City's heightened enforcement of housing and rental standards has a disparate impact on the availability of housing for individuals protected under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a). The City moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), and the district court[1] granted the motion. In light of the Supreme Court's decision in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015), we affirm.

I.

The Ellises' operative complaint spans 103 pages. An additional 193 pages of exhibits are attached to the complaint. Viewing the complaint in the light most favorable to the Ellises and accepting the facts alleged as true, we summarize the complaint's most significant allegations as follows. See McIvor v. Credit Control Servs., Inc., 773 F.3d 909, 912 (8th Cir. 2014).

In Minneapolis, there is a shortage of over 20,000 affordable housing units in the "very low income" category. In recent years, thousands of families have been on waiting lists for public housing and Section 8 vouchers. While a vacancy rate of 5% is considered healthy, the vacancy rate for affordable housing in Minneapolis was less than 1% in 2013. This rate remained substantially the same through 2015.

Minority groups are disproportionately affected by the shortage of affordable housing. For example, in 2010, the City reported that African American families made up approximately 76% of those on public housing and Section 8 waiting lists. African Americans, by comparison, make up only 18% of the Minneapolis population. These percentages remained substantially the same through 2015.

_____

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

-2-

Additionally, African American families and individuals make up the largest percentage of those seeking homeless shelter in Minneapolis and St. Paul. Indeed, a disproportionate percentage of African Americans in Minneapolis are in the "very low income" category and in need of rental housing.

In this context, the Ellises are for-profit, low-income rental housing providers. The Ellises own rental properties in inner-city areas where there is a high demand for affordable housing by individuals in minority groups. And, consistent with these demographics, most of the Ellises' tenants have been African American, mixed-race, or other minority families with children.

Since 2012, the Ellises have owned and managed three single-family homes, five duplex homes, and five multi-unit buildings. While most of the Ellises' properties are older buildings built before World War II, the properties "have been at all times substantially compliant with all appropriate codes and habitable as defined by the Minnesota State Building Code." Nevertheless, the Ellises assert that, since July 2012, the City has "targeted" the Ellises' properties with "illegal" inspections and "heightened" housing-code enforcement; applied "above minimum" housing standards; threatened to revoke their rental licenses; and issued "false" or "invalid" citations and orders for "claimed code violations that did not exist."

At one of the Ellises' duplexes, for example, a City inspector claimed six code deficiencies, but three alleged deficiencies were not deficiencies at all. The inspector claimed there was a rodent "infestation" when there were only "some mice droppings" and the first floor resident had not seen a mouse for over three months. The inspector also ordered the Ellises to hire a licensed exterminator even though "[t]here was no evidence of [a] 'widespread and severe' . . . mice infestation [as] required by the [housing code] for ordering an exterminator." Additionally, the inspector ordered the Ellises to hire a lead-abatement specialist even though only "three small areas" required touch-up paint.

-3-

At a second duplex, a City inspector found 24 "claimed" violations after a tenant called the City to complain. At least some of these violations also did not exist. For example, the inspector claimed there was illegal wiring requiring an electrician; in reality, only a fuse needed to be replaced. The inspector also claimed a ceiling, toilet, and floor were out of compliance, but "the ceiling was in standard condition," the Ellises' "workman found the toilet working properly," and there was "nothing wrong with the floor."

Regarding these purported code violations, the Ellises "attempted to comply" with the orders or "started to take corrective actions on the . . . claimed deficiencies that were specific and believed to be understood by [the Ellises] and their workman." (emphasis omitted). But, the Ellises assert, many of the City's orders were "vague" or "non-specific"—a violation of City ordinances. When the Ellises sought clarification of some of the City's orders, City officials were unresponsive. Further, when the Ellises attempted to appeal some violations, the City denied their appeal requests even though the City's orders informed the Ellises of their right to appeal. Regarding other citations, however, the City allowed appeals and admitted the Ellises were cited in error. For example, at two of the Ellises' multi-unit buildings, the City admitted certain "violations were grandfathered in and so no alterations [were] needed." The citations based on those violations were canceled.

The City has "continued to falsely claim that [two of the Ellises'] rental duplexes are substandard, hazardous[,] and do not meet licensing standards and cannot be occupied." As a result, the Ellises have been unable to rent the duplexes since Fall 2014 even though the Ellises have at "all times . . . receive[d] numerous calls each week from potential tenants, who are predominantly 'protected class' members . . . seeking affordable housing in [the Ellises'] rental properties."

The Ellises are also "under current threat . . . of fines and assessments and rental license revocations." Under City ordinances, property owners must license

-4-

their residential rental dwellings, and if they fail to comply with minimum standards and conditions, the City may revoke their rental licenses. The City website explains:

> Since 2005, the City has changed more than two dozen ordinances to strengthen rental licensing and property ownership standards to protect tenants from problem landlords. Because of these changes, the City has increased the number of rental licenses it has revoked by more than 500 percent for owners who have violated one or more rental license standards.

According to the Ellises, the City's "rental license revocations have displaced hundreds of 'protected class' families from their rental homes since July 31, 2012."

The Ellises assert that the City's actions are the result of a policy to discourage for-profit rental housing. The City "demands immediate actions by . . . for-profit housing providers to remedy all claimed code requirements without delay and to maintain properties in 'perfect,' 'professional state of repair' conditions." By contrast, the City "applies a preferential . . . 'hands off' code policy to its sister government agency's [public] rental dwellings." The City applies these preferential standards to public housing even though the public housing in Minneapolis "has a significant volume of documented and admittedly serious code violations." These violations include "decaying infrastructure, mold problems, . . . [and] corroded and blocked plumbing . . . [that] rais[es] concerns about the safety of the water." According to the Ellises, these are the "actual . . . 'minimum housing standards'" acceptable to the City. If the City were to apply the same standards to for-profit rental owners, the Ellises allege, the City's code enforcement would have less discriminatory impact on their provision of affordable housing to individuals protected under the FHA.

II.

On appeal, the Ellises argue that the district erred in granting the City's motion for judgment on the pleadings. We review the grant of a motion for judgment on the pleadings de novo. Corwin v. City of Independence, 829 F.3d 695, 699 (8th Cir. 2016). "We accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party." Id. (quoting Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir. 2002)). The same standards that govern motions to dismiss under Rule 12(b)(6) also govern motions for judgment on the pleadings under Rule 12(c). Haney v. Portfolio Recovery Assocs., L.L.C., 837 F.3d 918, 924 (8th Cir. 2016) (per curiam). "Pursuant to Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "We assess plausibility by 'draw[ing] on [our own] judicial experience and common sense.'" Haney, 837 F.3d at 924 (alterations in original) (quoting Iqbal, 556 U.S. at 679). "Further, we 'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" Id. (quoting Zoltek Corp. v. Structural Polymer Grp., 592 F.3d 893, 896 n.4 (8th Cir. 2010)). And "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 550 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A.

The Ellises allege that the City's actions disparately impact individuals protected by the FHA. Under the FHA, it is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or*

*otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (emphasis added). The Eighth Circuit has long recognized disparate-impact claims are cognizable under the FHA. See United States v. City of Black Jack, 508 F.2d 1179, 1184 (8th Cir. 1974). "In contrast to a disparate-treatment case, where a 'plaintiff must establish that the defendant had a discriminatory intent or motive,' a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2513 (2015) (quoting Ricci v. DeStefano, 557 U.S. 557, 577 (2009)).

Recently, in Inclusive Communities, the Supreme Court held that the FHA authorizes disparate-impact liability. Id. at 2525. The Court, however, stated that such liability must be "properly limited." Id. at 2522. "Disparate-impact liability," the Court noted, "mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies. The FHA is not an instrument to force housing authorities to reorder their priorities." Id. (quoting Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)). "Rather, the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation." Id. "It would be paradoxical to construe the FHA to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable." Id. at 2523.

The Supreme Court thus cautioned lower courts against allowing "the specter of disparate-impact litigation" to deter governmental entities "from achieving legitimate objectives." Id. at 2524. To illustrate this point, the Court singled out our decision in Gallagher v. Magner, 619 F.3d 823 (8th Cir. 2010). In Gallagher, much like the present case, the plaintiffs alleged that the City of St. Paul's aggressive housing-code enforcement had a disparate impact on racial minorities. 619 F.3d at

833.  We concluded the plaintiffs produced sufficient evidence to survive summary judgment on their claim, and we allowed the suit to proceed.  Id. at 833–38.  The Supreme Court, however, took a less-than-favorable view of our decision.  The Court stated:

> [G]overnmental entities . . . must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes. . . . [T]he well-stated principal dissenting opinion in this case call[s] attention to the decision by the Court of Appeals for the Eighth Circuit in [Gallagher].  Although the Court is reluctant to approve or disapprove a case that is not pending, it should be noted that [Gallagher] was decided without the cautionary standards announced in this opinion and, in all events, the case was settled by the parties before an ultimate determination of disparate-impact liability.

Inclusive Communities, 135 S. Ct. at 2524 (citation omitted).[2]

The "cautionary standards" announced in Inclusive Communities include a "robust causality requirement."  Id. at 2523.  According to the Court:

> [A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to *a defendant's policy or policies causing that disparity.*  A robust causality requirement ensures that "[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create.  Without adequate safeguards at the

---

[2] The Supreme Court's decision casts significant doubt on Gallagher.  Thus, at least to the extent it is inconsistent with Inclusive Communities and the present opinion, Gallagher is no longer binding precedent.  See United States v. Taylor, 803 F.3d 931, 933 (8th Cir. 2015) (per curiam) ("[A] prior panel ruling does not control 'when the earlier panel decision is cast into doubt by an intervening Supreme Court decision.'" (quoting United States v. Anderson, 771 F.3d 1064, 1067 (8th Cir. 2014))).

prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way . . . .

Id. at 2523 (emphasis and first alteration added) (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 653 (1989)).

The Supreme Court thus directed lower courts to "examine with care whether a plaintiff has made out a prima facie case of disparate impact." Id. The Court emphasized that "prompt resolution of these cases is important. A plaintiff who fails to allege facts at the pleading stage . . . demonstrating a causal connection [between a defendant's policy and a disparity] cannot make out a prima facie case of disparate impact." Id. Satisfying this requirement, however, may be difficult for a number of reasons. Id. For example, the Court stated that a plaintiff may "not easily be able to show th[at] a *policy* [is] causing a disparate impact because . . . a one-time decision may not be a policy at all." Id. (emphasis added).

These standards, the Court stated, are "necessary to protect potential defendants against abusive disparate-impact claims." Id. at 2524. "Were standards for proceeding with disparate-impact suits not to incorporate *at least* the safeguards discussed [in Inclusive Communities]," the Court warned, "disparate-impact liability might displace valid governmental and private priorities, rather than solely 'remov[ing] . . . artificial, arbitrary, and unnecessary barriers.'" Id. (emphasis and first alteration added) (quoting Griggs, 401 U.S. at 431). "And that, in turn, would set our Nation back in its quest to reduce the salience of race in our social and economic system." Id.

B.

We now turn to apply Inclusive Communities to the present case. As an initial matter, we reject the Ellises' argument that they were not required to plead facts

supporting a prima facie case of disparate impact. As noted above, under Inclusive Communities, "[a] plaintiff who fails to allege facts at the pleading stage . . . demonstrating a causal connection [between a policy and a disparity] cannot make out a prima facie case of disparate impact." 135 S. Ct. at 2523. The Ellises' reliance on Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), an employment discrimination case that predates Inclusive Communities, is therefore misplaced.

We also note that the Ellises mount no serious challenge to the housing code itself. To the extent their complaint mentions specific housing-code provisions, there are no factually supported allegations that those provisions are arbitrary or unnecessary to health and safety. See Inclusive Communities, 135 S. Ct. at 2524 ("Governmental or private policies are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers." (internal quotation marks and citation omitted)). And while the Ellises contend that the City should apply the lower standards it applies to public housing, the Ellises also contend that the City's public housing has "serious code violations" that "rais[e] concerns of safety." But "[t]he FHA is not an instrument to force housing authorities to reorder their priorities," id. at 2522, and an FHA disparate-impact claim may not be used to lower housing standards for everyone merely because housing standards are inconsistently applied.[3] The Ellises must still allege facts plausibly demonstrating that the housing-code standards complained of are arbitrary and unnecessary under the FHA. The Ellises' complaint fails to make these allegations.

The remainder of the Ellises' complaint does not fare much better. Most significantly, the Ellises allege that the City has adopted a policy to discourage rental

_____

[3] Inconsistent application of housing standards, of course, may be the basis for a *disparate-treatment* claim under the FHA. Nevertheless, we do not understand the Ellises to be arguing such a claim on appeal. And, in any event, the Ellises do not allege any facts suggesting that individuals protected under the FHA were treated inconsistently "because of" a protected characteristic. 42 U.S.C. § 3604(a).

housing and effected such a policy through deliberate or negligent misapplication of the housing code.  The City's housing code, however, is the most explicit statement of City policy in this case.  Most of the Ellises' complaint, therefore, boils down to allegations that the City has adopted an unannounced policy to *disregard* explicit City policy. Given more "obvious alternative explanation[s]" for the City's misapplication of the housing code—*e.g.*, good-faith errors or disagreements between the City and the Ellises with respect to violations—the Ellises' complaint must allege sufficient facts plausibly demonstrating that the City is, as a matter of policy, disregarding its own housing code.  See Iqbal, 556 U.S. at 682 (citation omitted); see also Inclusive Communities, 135 S. Ct. at 2523; City of Joliet v. New West, L.P., 825 F.3d 827, 830 (7th Cir. 2016) (noting that Inclusive Communities "stressed the importance of considering both whether a policy exists and whether it is justified").

To support their allegation of such a policy, the Ellises point to a 2009 City report.  That report, attached to the Ellises' complaint,[4] compiled numerous "personal and subjective assessment[s]" of community members (including City employees) concerning the City's progress in areas varying from housing and employment to arts and education.  The Ellises' complaint highlights several statements in the report expressing consternation with rental housing in Minneapolis.  These include statements urging the City to "[m]ake it more expensive and harder to rent out single-family homes" and to "[c]reate a long-term policy that will result in more owner-occupied single-family homes."  Another statement opines that Minneapolis "could benefit from a moratorium on rental licenses, but it's against the law."

The Ellises, however, largely ignore statements in the report that conflict with, qualify, or temper these views.  For example, the report also includes the view that "[t]he problem isn't tenants or the ratio of rentals to owned homes. . . .  The issue is

---

[4] We may consider exhibits attached to the complaint.  Neubauer v. FedEx Corp., 849 F.3d 400, 403 (8th Cir. 2017).

problem landlords." Additionally, the report includes a statement urging the City not to "discourage affordable housing" because "[a] lot of affordable housing projects are well managed and maintained." The report also states that "[i]nstituting a moratorium on rental[s] . . . would have a catastrophic impact on low-income families. If you eliminate whole neighborhoods from eligibility, people will have no place to go." And to the extent the report may mention housing-code enforcement at all, the report highlights a compliment of the City's "consistent[ ]" enforcement and a criticism that the City "tolerate[s] different standards in different areas." Thus, while it is arguably conceivable that the City would have adopted a policy of discouraging rental housing after hearing the complaints of some community members, the report is simply too inconsistent to support the Ellises' allegations. See Twombly, 550 U.S. at 570 (holding that plaintiffs must plead facts sufficient to "nudge[ ] their claims across the line from conceivable to plausible").

The City's misapplication of the housing code is likewise insufficient to support the Ellises' allegations of a City policy. Much of the complaint relies on conclusory allegations that the City has issued code citations for non-existent violations. Where the complaint does allege facts about code citations, moreover, the facts alleged do not plausibly suggest that the City's orders were made pursuant to a City policy to misapply the housing code. For example, the Ellises allege that, at one duplex, a City inspector improperly concluded there was a "widespread and severe" infestation of mice requiring a licensed exterminator. The Ellises, however, concede that "some mice droppings" were present on the duplex floor. The Ellises' allegations thus suggest no more than disagreement between the Ellises and the City on the extent of deficiencies based on reasonable housing-code provisions.

Further, the fact that the Ellises have had numerous disagreements with the City over application of the housing code does not, without more, plausibly suggest a City *policy* to misapply the housing code. The Ellises, in essence, attempt to bootstrap numerous "one-time decision[s]" together in order to allege the existence

-12-

of a City policy to misapply the housing code. See Inclusive Communities, 135 S. Ct. at 2523. But, given the varying and evolving contexts in which such codes must be applied, it is to be expected that the application of housing codes be less than perfect. And "governmental entities . . . must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes." Id. at 2524. If "the specter of disparate-impact litigation" were allowed to influence how housing inspectors respond to marginal disagreements about, for example, the extent of a rodent problem, the government's legitimate interest in ensuring minimum housing standards would be thwarted. See id. Governmental entities therefore must have the leeway to apply reasonable housing-code provisions without fear of inviting a costly lawsuit.

This leeway is important for tenants as well as governmental entities. Reasonable housing-code standards and the FHA, of course, are intended to protect these individuals. "From the standpoint of determining advantage or disadvantage to racial minorities" the Ellises allege have been disparately impacted by the City's actions, "it seems difficult to say . . . that a decision to [order a licensed exterminator as opposed to setting out mouse traps] is discriminatory." See id. at 2523. After all, "[n]o one wants to live in a rat's nest." Id. at 2532 (Alito, J., dissenting).

III.

In sum, we conclude the Ellises have not pleaded a prima facie case of disparate impact under the FHA. Under Inclusive Communities, a plaintiff must, at the very least, point to an "artificial, arbitrary, and unnecessary" policy causing the problematic disparity. Because the Ellises have not pleaded sufficient facts to

-13-

plausibly support the existence of such a policy, we affirm the judgment of the district court.[5]

_____

_____

[5] We conclude that the district court's disposition of the other allegations contained in the Ellises' complaint was appropriate. See 8th Cir. R. 47B.