Filed 3/3/22

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| CRENSHAW SUBWAY COALITION, | B309288 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS174553) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents; | |
| HAAS BHCP PROPERTY OWNER, LLC, | |
| Real Party in Interest and Respondent. | |

---

\*     This opinion is published as to all parts except Part II of the Discussion.

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge. Affirmed.

Strumwasser & Woocher, Beverly Grossman Palmer, Caroline Chiappetti, and Salvador E. Perez for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Terry Kaufmann-Macias, Assistant City Attorney, John W. Fox, Craig Takenaka, Mei-Mei Cheng, Elaine Zhong, Deputy City Attorneys; Burke, Williams & Sorensen, Charles E. Slyngstad, Nicholas J. Muscolino; Thomas Law Group and Amy Higuera for Defendants and Respondents.

Alston & Bird and Edward J. Casey for Real Party in Interest and Respondent.

* * * * * *

After the City of Los Angeles (the City) approved a project aimed at "revitaliz[ing]" a neighborhood in South Los Angeles through the renovation and expansion of an existing shopping mall and the construction of additional office space, a hotel, and new apartments and condominiums, a neighborhood advocacy group sued to enjoin the project under the federal Fair Housing Act (42 U.S.C. § 3601 et seq.) and California's Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). The group's lawsuit rests on a "gentrification" theory—namely, that the project will lead to an "influx of new, more affluent residents"; that this influx will lead to "increased rents and increased property values that [will] put pressure" on the low-income residents who currently live near the project site; and that these

2

higher rents will push the low-income residents out of "their neighborhoods." Because a majority of these low-income residents are Black or Latinx, the group alleges, the project has the effect of "mak[ing]" "dwellings" "unavailable" "because of race[ and] color" in violation of the disparate impact prong of the Fair Housing Act (and, thus, by extension, the FEHA).

Is a disparate impact claim based on this gentrification theory cognizable under the Fair Housing Act? We conclude it is not, and this conclusion is dictated by the United States Supreme Court's decision in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.* (2015) 576 U.S. 519 (*Inclusive Communities*). In no uncertain terms, *Inclusive Communities* held that the Fair Housing Act does not afford relief if such relief "cause[s] race to be used and considered in a pervasive and explicit manner [in deciding whether] to justify governmental or private actions" because doing so "inject[s] racial considerations into [the] decision." (*Id.* at p. 543.) Because the Fair Housing Act itself was enacted to combat (and hence only prohibits) those policies and practices that "ha[ve] a 'significantly disparate impact on *nonwhites*'" (*Hardie v. NCAA* (9th Cir. 2017) 876 F.3d 312, 319 (*Hardie*), quoting *Wards Cove Packing Co. v. Atonio* (1989) 490 U.S. 642, 658 (*Wards Cove*), italics added), the gentrification theory would be available—if at all—only when the low-income residents who are displaced by revitalization efforts are minorities. Thus, recognizing the group's gentrification theory would obligate the City to "use[] and consider[]" race in making local planning decisions, and thus the group's gentrification theory is not cognizable under the Fair Housing Act (and, by extension, the FEHA).

For this reason and others, we affirm the dismissal of the group's gentrification-based claims under the Fair Housing Act and FEHA. In the unpublished portion of our opinion, we also affirm the dismissal of the group's claim under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) as untimely.

## FACTS AND PROCEDURAL BACKGROUND

I.     **Facts[1]**

A.     *The Project*

In South Los Angeles, there is a 43-acre parcel of property, shaped somewhat like a shark's dorsal fin, that is bounded on the north by 39th Street, on the east by Crenshaw Boulevard, on the south by Stocker Street, and on the west by Santa Rosalia Drive and Marlton Avenue; Martin Luther King Jr. Boulevard runs east-west through the center of the parcel. The parcel is currently home to the Baldwin Hills Crenshaw Plaza, which features an enclosed mall, a movie theatre, a few commercial establishments, a small amount of office space, and surface parking lots and parking structures; the parcel contains no residential dwellings. The Crenshaw/LAX light rail line, which currently is under construction, will eventually run through the parcel.

Beginning in 2008 and after various proposals, three private entities—Capri Urban Baldwin, LLC; Capri Urban Crenshaw, LLC; and Capri Urban Rosalia, LLC (collectively, the

---

1      These facts are drawn from the operative third amended complaint as well as documents judicially noticed by the trial court.

4

developer)[2]—applied to the City to redevelop the parcel by leaving most of the mall and theatre intact, but demolishing a portion of the mall and the office space and constructing a "mixed-use" facility with a net floor area exceeding 3 million square feet (the Project).  At the end of the 20-year lifespan of the Project's construction, the Project would have 331,838 square feet of retail and restaurant space; 143,377 square feet of office space; a new, 400-room hotel; and 961 new residential units, comprised of 551 condominiums for purchase and 410 apartments for rent. Ultimately, the developer agreed to set aside 10 percent of each type of the residences for affordable housing—specifically, 5 percent of the condominiums would be available only to persons earning less than 50 percent of the area median income and another 5 percent would be available for members of the workforce earning at most 150 percent of the area median income; and 5 percent of the apartments would be available to persons earning less than 60 percent of the area median income and another 5 percent would be available to persons earning less than 80 percent of the area median income.  The developer also agreed to hire 25 percent of the workforce used to build and operate the Project from the local community.

B.     *The surrounding neighborhood*

The Project is "near" the Leimert Park neighborhood and within the "Crenshaw Corridor."  Together, these areas have "served as the political, cultural, and commercial heart of Black Los Angeles" since the 1960's, and are one of the "last majority Black communities in the City of Los Angeles."  Census data indicates that in Leimert Park, 65 percent of the residents are

---

[2]     The parcel was subsequently purchased by HAAS BHCP Property Owner, LLC, which is now the developer.

5

Black and 25 percent of the residents are Latinx, and in the Crenshaw Corridor, 43 percent of the residents are Black and 47 percent of the residents are Latinx.

### C. *Administrative proceedings*

#### 1. *Department of City Planning*

The Los Angeles City Council has designated the Department of City Planning (the Department) as its "Advisory Agency" to approve vesting tentative tract maps for anticipated land use projects. (L.A. Mun. Code, §§ 17.03.A., 17.06.) Once approved, a vesting tentative tract establishes "certain rights to proceed with development." (*Id.*, § 17.02.)

On December 21, 2016, the Department held a noticed hearing to decide, among other things, whether (1) to approve the vesting tentative tract map for the Project, and (2) to certify the final environmental impact report that had been prepared for the Project.

On January 18, 2017, the Department issued a letter of determination that (1) approved the vesting tentative tract map, and (2) certified the final environmental impact report.

The Department did not issue a notice of determination until March 20, 2017, which was 61 days after the issuance of its letter of determination.

#### 2. *City Planning Commission*

In July 2017, the City Planning Commission held a hearing to consider several other issues necessary to enable the Project to move forward—chiefly, whether to recommend that the City Council change the zoning and height district designation of the Project's parcel.

On August 3, 2017, the City Planning Commission issued a letter stating its finding that no further environmental impact

analysis was required, and recommending that the City Council adopt the proposed changes to the zoning and height district designation.

        3.     *Planning and Land Use Management (PLUM) Subcommittee*

At the behest of several groups who appealed the City Planning Commission's determination, the City Council's PLUM Subcommittee held a hearing in early June 2018. The PLUM Subcommittee subsequently issued a report recommending denial of the appeals, concluding that no further environmental impact analysis was required, and recommending that the City Council adopt the proposed changes to the zoning and height district designation.

        4.     *City Council*

At its June 27, 2018 meeting, the City Council unanimously voted to adopt the PLUM Subcommittee's recommendations, thereby denying the appeals, concluding that no further environmental impact analysis was required, and enacting the ordinances necessary to change the zoning and height district designation of the Project's parcel.

## II.   Procedural Background

### A.   *Operative pleading*

On July 30, 2018, the Crenshaw Subway Coalition (the Coalition) sued the City of Los Angeles and the City Council (collectively, the City), as well as the developer, to enjoin the Project. The Coalition is a "nonprofit organization of residents, property owners and merchants in the South Los Angeles community" who are "firmly opposed" to "gentrification" that would "displace long-standing Black and Latinx residents." In

7

the operative pleading, the Coalition alleges that the Project violates (1) the Fair Housing Act, (2) FEHA, and (3) CEQA.[3]

### B. *Dismissal of the fair housing-related claims*

#### 1. *The allegations*

In the operative third amended complaint,[4] the Coalition alleged that the Project violated the Fair Housing Act and FEHA due to the gentrification it would cause. Specifically, the Coalition alleged that (1) the Project will lead to an "influx of new, more affluent residents," (2) this influx will lead to "increased rents and increased property values that [will] put pressure on existing, lower income residents" in the neighborhoods near the Project, (3) these higher rents will "push" the lower-income residents, who are "already rent-burdened" because they spend more than 50 percent of their household income on rent, "from their homes in the neighborhoods around the Project," and (4) this displacement will fall predominantly upon "lower income Black and Latinx residents" living in those neighborhoods. The danger of displacement due to the Project is particularly high, the Coalition alleged, because a study conducted by the City using data from 2000 to 2014 showed that these neighborhoods already had a "high" or "very high" "index of displacement." The Coalition's pleading acknowledged that "the goal[s] of the Project" were "to serve as 'a catalyst for economic

---

[3]    The initial pleading filed on July 30, 2018, was a petition for a writ of mandate against the City alleging only a violation of CEQA. The Coalition filed a first amended petition and complaint on September 24, 2018, which added the two housing discrimination claims against the City and the developer.

[4]    The trial court had sustained the City and the developer's demurrer to the second amended complaint with leave to amend.

development in South Los Angeles,'" "'to contribute to the revitalization of the West Adams-Baldwin Hills-Leimert Park'" neighborhoods, and "'to eliminate and prevent the spread of blight and deterioration by providing housing ownership opportunities, together with retail, hotel, office and restaurant uses, and public open space,'" but alleged that this justification was "no[t] legally sufficient" and could in any event "be served by other, properly[ ]enacted policies, practices and decisions that have a less discriminatory effect."  As relief, the Coalition sought an injunction halting the Project unless and until "adequate measures" were taken "to ensure that the Project would not displace protected minorities."  The Coalition's pleading did not specify what measures would be adequate:  At some points during the administrative review process, the Coalition suggested that setting aside *all* of the new, 961 residential units for low-income residents; at other points, the Coalition suggested that the developer also be required to build "other permanent affordable housing . . . near the Project.

### 2. *Demurrer*

The City and the developer demurred to the Coalition's fair housing-related claims.  After briefing and a hearing, the trial court in May 2019 overruled the demurrer.  Specifically, the court found that the City's decision approving the 20-year-long Project constituted a "policy" (rather than a "one-off decision") and that the Coalition had "met its pleading burden" of alleging that the Project would have a "disparate impact" by "displac[ing] Black and Latinx populations in the immediate environs."

### 3. *Motion for judgment on the pleadings*

In July 2020, the City and the developer filed a motion for judgment on the pleadings based on new case law—namely, the

opinion in *AIDS Healthcare Foundation v. City of Los Angeles* (June 15, 2020, B303308), review den. and opn. ordered nonpub. Sept. 2, 2020, S263550 (*AIDS Healthcare*), which rejected a gentrification-based lawsuit under the Fair Housing Act. After briefing and a hearing, the trial court granted the motion. The court ruled that *AIDS Healthcare* was "equally applicable" in this case "because of the substantially similar allegations."

### C. *Dismissal of CEQA Claim*

In the second amended complaint, the Coalition alleged that the City had violated CEQA. The City demurred to that claim. In February 2019, the trial court sustained the demurrer (and granted leave to amend, but the Coalition elected not to do so and instead to stand on its claim as previously alleged). The court found that the Coalition's challenge to the City's CEQA finding was untimely because the Coalition's July 2018 lawsuit was filed more than 30 days after the City posted its notice of determination in March 2017 and, alternatively, more than 180 days after the City's anointed advisory agency approved the vesting tentative tract map and certified the final environmental impact report in January 2017.

### D. *Appeal*

Following the entry of judgment against the Coalition on all of its claims in September 2020, the Coalition filed this timely appeal.

## DISCUSSION

The Coalition argues that the trial court (1) erred in granting judgment on the pleadings on its Fair Housing Act and FEHA claims because the California Supreme Court subsequently ordered the *AIDS Healthcare* decision depublished,

and (2) erred in sustaining the demurrer to its CEQA claim because its July 2018 lawsuit was timely filed.

Our task in evaluating orders granting judgment on the pleadings or sustaining a demurrer without leave to amend is the same: We accept as true the allegations in the operative pleading along with any documents properly subject to judicial notice, and ask (1) whether the pleading states a "legally cognizable cause of action" and, if it does, (2) whether the pleading also alleges facts sufficient to support that cause of action. (*IMO Development Corp. v. Dow Corning Corp.* (1982) 135 Cal.App.3d 451, 457; *Sparks v. City of Compton* (1976) 64 Cal.App.3d 592, 596-597; *Alameda County Waste Management Authority v. Waste Connections US, Inc.* (2021) 67 Cal.App.5th 1162, 1174 (*Alameda County*); Code Civ. Proc., § 438, subds. (c)(1)(B) & (d).) Our review is de novo. (*Alameda County*, at p. 1174.) Leave to amend is properly denied when a plaintiff's underlying theory is legally invalid and cannot be cured by additional allegations. (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.)

## I.     Fair Housing Act and FEHA Claims

The Coalition contends that the trial court's dismissal of its Fair Housing Act and FEHA claims was legally incorrect. Before addressing the viability of the Coalition's claim under each statute, we address two threshold issues.

### A.     *Threshold issues*

#### 1.     *Automatic reversal*

The Coalition asserts that we need not analyze the viability of its claims under the Fair Housing Act or FEHA because (1) the trial court's ruling granting judgment on the pleadings was based *solely* on the *AIDS Healthcare* opinion, and the depublication of that opinion means that there is no basis for the court's ruling,

11

which must therefore be automatically reversed; and (2) we may not consider any further arguments in favor of affirmance because (a) the City and the developer never sought appellate review of the trial court's earlier order overruling their demurrers to these claims, and (b) the City and the developer are judicially estopped from making any argument in favor of dismissal *beyond* an *AIDS Healthcare*-based argument because such arguments would be inconsistent with their earlier position that *AIDS Healthcare* alone warranted dismissal.

We reject these arguments.

To begin, the depublication of *AIDS Healthcare* is not dispositive of this appeal. Our task is to review the ruling dismissing the Coalition's claims, not its rationale. (*Alameda County*, *supra*, 67 Cal.App.5th at p. 1174; *People v. Zapien* (1993) 4 Cal.4th 929, 976 [noting "firmly established" rule that appellate courts review the trial court's ruling, not its rationale].) Nor can we infer our Supreme Court's disapproval of the reasoning or holding of *AIDS Healthcare* from the fact of depublication; the California Rules of Court expressly preclude us from doing so. (Cal. Rules of Court, rule 8.1125(d) ["A Supreme Court order to depublish is not an expression of the court's opinion of the correctness of the result of the decision or of any law stated in the opinion."]; accord, *Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 108.)

We are also not barred from considering alternative arguments in support of the trial court's order. The failure of the City and the developer to seek appellate review of the trial court's prior order overruling their demurrers to the third amended complaint is of no moment. They had no right to appeal that prior order in the first place (e.g., *Apple Inc. v. Superior Court*

12

(2017) 18 Cal.App.5th 222, 238-239 ["'An order overruling a demurrer is not directly appealable . . . .'"]), and their failure to seek a discretionary writ from that prior order would not have precluded them from attacking that ruling in an appeal from a final judgment (e.g., *People v. Mena* (2012) 54 Cal.4th 146, 156); their failure to seek appellate review therefore does not preclude them from making arguments that attack the prior demurrer ruling when articulating alternative grounds for affirming the trial court's subsequent order granting their motion for judgment on the pleadings. The City and the developer are also not judicially estopped from making arguments beyond those based on *AIDS Healthcare*. Judicial estoppel only precludes a litigant from taking *inconsistent* positions before a tribunal (e.g., *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422); arguing that a theory is invalid for one reason is not inconsistent with arguing that a theory is invalid for another reason, at least where, as here, the reasons are in the alternative and not inconsistent with one another. Indeed, the Code of Civil Procedure expressly authorizes a litigant to file a motion for judgment on the pleadings *after* filing an unsuccessful demurrer if the motion for judgment on the pleadings is made on a different ground. (Code Civ. Proc., § 438, subd. (g)(2).) Here, the grounds advanced in the prior demurrer are different from the ground upon which we are now affirming.

2. *Scope of this appeal*

The Coalition's gentrification theory implicates issues of urban renewal, socioeconomic inequality, and racial injustice. How to balance the social benefits of revitalizing blighted neighborhoods against the resulting social costs of gentrification is a question for our elected officials—not for this court. Elected

13

officials are the ones who must grapple with these issues in deciding which projects to approve, where they should be sited, and how to mitigate the potential negative impacts of those projects on the surrounding neighborhoods by requiring or incentivizing developers to take actions that benefit local residents (such as setting aside affordable housing or employing local labor).  (E.g., L.A. Mun. Code §§ 12.22.A.25, 12.22.A.31, 12.24.U.26, 14.00.A.10; L.A. Admin. Code, § 5.582.)

Our task is much more limited:  We decide only whether the claims that the Coalition alleged in the operative complaint are legally cognizable under the Fair Housing Act and FEHA. For the reasons described below, the *Inclusive Communities* decision by the United States Supreme Court dictates the conclusion that they are not.

## B.   *Fair Housing Act claim*

### 1.   *The Fair Housing Act, generally*

As its name suggests, the aim of the Fair Housing Act is "to provide, within constitutional limitations, for fair housing throughout the United States."  (42 U.S.C. § 3601; 82 Stat. 81.) To do this, and among other ways, the statute makes it unlawful to "make . . . unavailable . . . a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  (42 U.S.C. § 3604(a).)[5]  As pertinent here, "[a] dwelling can be made . . . unavailable by, among other things, [a practice or policy] that limits the availability of affordable housing" for protected groups.

---

[5]   In full, this provision provides that it shall be unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  (42 U.S.C. § 3604(a).)

14

(*Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mt. Holly* (3d Cir. 2011) 658 F.3d 375, 381 (*Mt. Holly*).)

There are two types of Fair Housing Act claims. The first is a disparate treatment claim. To prevail, the plaintiff bringing a disparate treatment claim "'must establish that the defendant had a discriminatory intent or motive'" when it undertook the challenged practice or policy. (*Inclusive Communities*, *supra*, 576 U.S. at p. 524, quoting *Ricci v. DeStefano* (2009) 557 U.S. 557, 577.) The second is a disparate impact claim. To prevail, the plaintiff bringing a disparate impact claim must establish that the challenged practice or policy has "a 'disproportionately adverse effect on minorities [or other protected group]' and [is] otherwise unjustified by a legitimate rationale." (*Inclusive Communities*, at p. 524; see also *id.* at p. 534.)

2.      *Disparate impact claims, specifically*

Disparate impact claims are critical to the efficacy of the Fair Housing Act. Liability that turns solely on a showing of discriminatory impact (rather than upon discriminatory intent or motive) "permits plaintiffs to counteract unconscious prejudices and disguised animus," and thus "serves to uncover unconscious or consciously hidden biases." (*Inclusive Communities*, *supra*, 576 U.S. at p. 540; *Avenue 6E Investments, LLC v. City of Yuma* (9th Cir. 2016) 818 F.3d 493, 503 (*Avenue 6E*).) Liability that turns solely on a showing of discriminatory impact (rather than upon discriminatory intent or motive) "also targets 'artificial, arbitrary, and unnecessary barriers' to minority housing and integration that can occur through unthinking, even if not malignant, policies" and practices. (*Avenue 6E*, at p. 503, quoting *Inclusive Communities*, at p. 540.)

15

At the same time, the United States Supreme Court has held that the Fair Housing Act is not a panacea against all wrongs. Instead, it was enacted to address historically entrenched "segregated housing patterns" and was designed to end that segregation by "eradicat[ing] discriminatory practices within [the housing] sector" that "exclude minorities." (*Inclusive Communities, supra*, 576 U.S. at pp. 528, 539.) It was *not* meant to "displace[] . . . valid governmental policies." (*Id.* at p. 540.) Because disparate impact liability looks solely to disproportionate effect without regard to the intent or motive behind the practice or policy, and because a practice or policy may end up having a disproportionate effect on minorities even when it serves a valid government policy, the Supreme Court has seen fit to "properly limit[]" disparate impact claims by articulating "safeguards" and "cautionary standards" to ensure that such claims do not sweep beyond the purpose—and hence the scope—of the Fair Housing Act. (*Inclusive Communities*, at pp. 540, 541, 544; *Oviedo Town Center II, L.L.L.P. v. City of Oviedo* (11th Cir. 2018) 759 Fed.Appx. 828, 834 *(Oviedo Town Center)* [observing how *Inclusive Communities* "cabin[ed] disparate-impact liability" because that "theory of liability . . . would create substantial difficulties if applied too expansively"].) Whether "the merits" of an alleged disparate impact claim remain within these limits is to be "rigorous[ly] examin[ed]" "at the pleading stage." (*Burbank Apartments Tenant Assn. v. Kargman* (2016) 474 Mass. 107, 127 (*Burbank Apartments*).) Disparate impact claims that fall outside "the purview" of the Fair Housing Act are not legally cognizable and are properly dismissed at that stage. (*Laramore v. Illinois Sports Facilities Auth.* (N.D.Ill. 1989) 722 F.Supp. 443, 452; *Southend Neighborhood Improvement Assn. v. County of St.*

*Clair* (7th Cir. 1984) 743 F.2d 1207, 1210 [dismissal is appropriate when the Fair Housing Act was "not designed to address the concerns raised by the complaint"].)

Three of the "cautionary standards" and "safeguards" articulated in *Inclusive Communities* are relevant here.

First, *Inclusive Communities* held that the Fair Housing Act does not encompass disparate impact claims that "cause[] race to be used and considered in a pervasive and explicit manner to justify governmental or private actions" because construing the Fair Housing Act to "inject[] race into a city's decisionmaking process" raises "serious constitutional concerns" and "ten[d]s to perpetuate race-based considerations rather than move beyond them." (*Inclusive Communities*, *supra*, 576 U.S. at pp. 542-543; *Oviedo Town Center*, *supra*, 759 Fed.Appx. at p. 834.) Put differently, courts are not to interpret "disparate-impact liability" under the Fair Housing Act "to be so expansive as to inject racial considerations into every housing decision." (*Inclusive Communities*, at p. 543; accord, *Wards Cove*, *supra*, 490 U.S. at p. 654 [interpreting the anti-discrimination provisions of Title VII of the Civil Rights Act in a way that "almost inexorably lead[s] to the use of numerical quotas in the workplace" is "a result that Congress and this Court have rejected repeatedly in the past"].)

Second, *Inclusive Communities* held that the Fair Housing Act does not encompass disparate impact claims that coopt the act into an "instrument to force housing authorities to reorder their priorities" and thereby "displace[] . . . valid governmental policies." (*Inclusive Communities*, *supra*, 576 U.S. at p. 540.) This is because the Fair Housing Act "does not decree a particular vision of urban development" and "does not put housing authorities and private developers in a double bind of

17

liability, subject to suit" no matter where they authorize and build "new low-income housing." (*Id.* at p. 542; *Inclusive Communities Project, Inc. v. Lincoln Property Co.* (5th Cir. 2019) 920 F.3d 890, 903 (*Lincoln*).)  A disparate impact claim lies beyond the purview of the Fair Housing Act if "the specter of disparate-impact litigation [on the theory underlying a Fair Housing Act claim] causes private developers to no longer construct or renovate housing units for low-income individuals" because, by recognizing such a claim, "the [Fair Housing Act] would have undermined its own purpose as well as the free-market system." (*Inclusive Communities*, at p. 544.)

Third, *Inclusive Communities* acknowledged that, while the Fair Housing Act does not categorically prohibit the consideration of race "in certain circumstances and in a proper fashion," the act will not sanction disparate-impact claims that have the effect of "perpetuating" "racial isolation" and segregation.  (*Inclusive Communities*, *supra*, 576 U.S. at pp. 540, 545, 546; *Southwest Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement District* (9th Cir. 2021) 17 F.4th 950, 960 (*Southwest Fair Housing*) [the Fair Housing Act "'forbids actions . . . that . . . perpetuate housing segregation'"]; cf. *Resident Advisory. Bd. v. Rizzo* (3d Cir. 1977) 564 F.2d 126, 129, 143 [public agency's obstruction of project that would further racial integration of community is actionable].)  That is because the Fair Housing Act's underlying and overarching tenet is to "mov[e] the Nation toward a more integrated society." (*Inclusive Communities*, at pp. 546-547.)  Contrary to what the Coalition argues, nothing in *Inclusive Communities* limits the Fair Housing Act's prohibitions against claims perpetuating segregation to only that subset of segregation that is "to the detriment of minorities."

3. *Analysis*

The gentrification-based theory of liability alleged by the Coalition is not a legally cognizable disparate impact claim under the Fair Housing Act because it runs afoul of the three "cautionary standards" articulated above.

The gentrification theory necessarily injects racial considerations into the City's decisionmaking process. That is because this theory is premised on the allegation that the persons displaced by the gentrification are members of minority groups. The race-dependent availability of the gentrification theory is a function of the scope of the Fair Housing Act's protections. The Fair Housing Act only prohibits policies and practices that discriminate—by intent or by effect—on the basis of "race, color, religion, sex, familial status, or national origin." (42 U.S.C. § 3604 (a).) The Fair Housing Act does not reach discrimination on the basis of socioeconomic status (*United States v. City of Birmingham* (E.D.Mich. 1982) 538 F.Supp. 819, 830 ["discrimination on the basis of wealth" not prohibited by the Fair Housing Act]; see generally, *San Antonio Indep. School Dist. v. Rodriguez* (1973) 411 U.S. 1, 29 ["wealth discrimination" is not a protected class under equal protection principles]), and does not reach discrimination on the basis of race unless it has a "'significantly disparate impact on *nonwhites*'" (*Hardie, supra*, 876 F.3d at p. 319, quoting *Wards Cove, supra*, 490 U.S. at p. 658, italics added). Thus, if gentrification were a valid theory for relief under the Fair Housing Act, city officials would be required to avoid gentrification-based displacement for a potential development located in a majority minority community, but not

19

for one in a mostly white community.[6]  Thus, accepting gentrification as a valid theory would inexorably "cause[] race to be used and considered in a pervasive and explicit manner [in deciding whether] to justify governmental or private actions," thereby "inject[ing] racial considerations into [the] decision." (*Inclusive Communities*, *supra*, 576 U.S. at p. 543.)  *Inclusive Communities* says such a theory is not cognizable under the Fair Housing Act.

By requiring a developer either to dedicate every new residential unit it builds to affordable housing and perhaps also to obligate the developer to build additional affordable housing off site in the adjoining neighborhoods, the net effect of the gentrification theory is to summon "the specter of disparate-impact litigation" in a way that would cause "private developers to no longer construct or renovate housing units for low-income individuals." (*Inclusive Communities*, *supra*, 576 U.S. at p. 544.) *Inclusive Communities* says such a theory is not cognizable under the Fair Housing Act.

As the Coalition's allegations make clear, the evil of gentrification is that it "displace[s] Black and Latinx residents" from some of the "the last majority Black communities in Los Angeles."  According to the Coalition, this concentration of Black

_____

**6**     Although whites have standing to raise Fair Housing Act claims when nonwhites are victimized (e.g., *Wentworth v. Hedson* (E.D.N.Y. 2007) 493 F.Supp.2d 559, 566 [so noting]), nonwhites would not be victimized in significant measure by gentrification that displaces mostly white residents (*Southwest Fair Housing*, *supra*, 17 F.4th at p. 961 [requiring "'a significantly . . . disproportionate impact on persons'" belonging to a group protected by the Fair Housing Act].)

20

residents and their Latinx neighbors is what forms "the political, cultural, and commercial heart of Black Los Angeles." The Coalition's gentrification theory *exists* to protect this concentration of minority community members, and thus seeks to employ the Fair Housing Act as a means of preserving the racial composition of these communities. However politically, culturally, historically, and commercially beneficial such segregation might be for those resulting communities, the Fair Housing Act was designed as a tool for "moving . . . toward a more integrated society," not a less integrated one. (*Inclusive Communities*, *supra*, 576 U.S. at p. 547.) That the Coalition's gentrification theory is seeking to perpetuate the segregation of a blended community of two minority groups (rather than a single minority group) does not, as the Coalition suggests, mean that the theory is not perpetuating segregation; that is because the theory is still aimed at preventing the displacement of these groups by others and is thus still designed to prevent a more fully integrated community. *Inclusive Communities* says claims that perpetuate segregation are inimical to the core purpose of the act and, as such, are not cognizable under it.

4.     *The Coalition's chief argument*

The Coalition makes a two-part argument as to why we must reverse the trial court's grant of judgment on the pleadings—namely, (1) its operative complaint sufficiently alleges a prima facie case of disparate impact discrimination, and (2) doing so is sufficient to ward off the City and the developer's attack on the sufficiency of the pleadings.

The concept of a prima facie case originated in precedent arising under Title VII of the Civil Rights Act (42 U.S.C. § 2000e et seq.) and the Age Discrimination in Employment Act (ADEA)

21

(29 U.S.C. § 621 et seq.). Being able to state a prima facie case is the first step in a three-step, burden-shifting rubric that is designed to assess the merit of disparate impact claims under statutes authorizing such claims as a means of challenging unlawful discrimination. (*Southwest Fair Housing*, *supra*, 17 F.4th at pp. 960-961.) In this first step, the plaintiff has the burden of showing "a prima facie case of disparate-impact discrimination." (*Id.* at p. 960.) Under the Fair Housing Act, this means the plaintiff must show that (1) the defendant has implemented a facially neutral "policy" (rather than making a "one-time decision"), (2) the policy has a "significantly adverse or disproportionate effect" on a protected class, and (3) there is a "robust" "causal connection" between the policy and the disproportionate effect, which is typically demonstrated through "statistical evidence." (*Inclusive Communities*, *supra*, 576 U.S. at pp. 542-543; *Southwest Fair Housing*, at p. 961; *Oviedo Town Center*, *supra*, 759 Fed.Appx. at p. 834; *Connecticut Fair Housing Center v. CoreLogic Rental Property Solutions, LLC* (D.Conn. 2020) 478 F.Supp.3d 259, 287 [referring to "robust causation" as a species of "proximate cause"]; cf. *Swierkiewicz v. Sorema N.A.* (2002) 534 U.S. 506, 511-512 [pleading alleging disparate impact in an *employment* discrimination case need not plead a prima facie case and need only include a "short and plain statement of the claim" showing entitlement to relief].)[7] The plaintiff's burden

[7]  *Inclusive Communities* was the first decision to require the more onerous showing of "robust causation." Prior to that, a plaintiff was required only to show that the defendant's policy "actually or predictably result[ed] in" a discriminatory impact (*Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1420 (*Sisemore*)) or that the policy caused "a significantly adverse or disproportionate impact" on a protected class (*Committee*

22

during this first step "is not intended to be 'onerous[]' [citation]" because "a *prima facie* case, by itself, is not enough to establish liability under the [Fair Housing Act]" and is meant to be an entrée to further analysis. (*Avenue 6E*, *supra*, 818 F.3d at p. 513; *Mt. Holly*, *supra*, 658 F.3d at p. 385; *Abed v. Western Dental Services, Inc.* (2018) 23 Cal.App.5th 726, 739.) If the plaintiff carries his burden, the rubric moves to the second step, where "the burden shifts to the defendant" to prove that its policy "is necessary to achieve a valid" and "legitimate interest." (*Inclusive Communities*, at p. 541; *Mt. Holly*, at p. 382; *Southwest Fair Housing*, at p. 967.) For these purposes, "necessary" does not mean "essential" or "indispensable"; instead, it means that the policy "in a significant way" "serves" "a legitimate business [or governmental] interest." (*Southwest Fair Housing*, at pp. 967-968.) And if the defendant carries the burden in this second step of showing a justifiable policy, then the rubric moves to the third step, where "the burden shifts back to the plaintiff to show the availability of an alternative practice that has less discriminatory impact yet is still equally effective in serving the defendant's legitimate goals." (*Southwest Fair Housing*, at p. 961; *Inclusive Communities*, at p. 533.)

We need not address the parties' lengthy arguments about whether the Coalition has sufficiently alleged a prima facie case of disparate impact discrimination under the Fair Housing Act because we will assume, for sake of argument, that it has done so

---

*Concerning Community Improvement v. City of Modesto* (9th Cir. 2009) 583 F.3d 690, 711).

The federal courts are deeply divided over precisely what showing satisfies *Inclusive Communities*'s "robust causation" test. (See *Lincoln*, *supra*, 920 F.3d at pp. 903-907 [detailing a four-way split on the meaning of this test].)

23

and has thereby established the first part of its two-part argument.[8]  However, we conclude that the Coalition has not established the second part of its argument because the Coalition's success in alleging a prima facie case does not insulate its disparate-impact claim from the dismissal compelled by *Inclusive Communities*.

That is because the three-step, burden-shifting rubric is merely an evidentiary standard designed to shift the *burden of production* back and forth in order to suss out the valid disparate impact claims from the invalid.  (*Inclusive Communities*, *supra*, 576 U.S. at p. 527; *Southwest Fair Housing*, *supra*, 17 F.4th at p. 961.)  At all times, the *burden of proof* remains with the Fair Housing Act plaintiff.  (*Southwest Fair Housing*, at p. 967 ["'[t]he ultimate burden of proving that discrimination against a protected group has been caused by a specific . . . practice

8    Our assumption renders it unnecessary to address whether (1) the three-step, burden-shifting rubric is defined by *Inclusive Communities* or instead by regulations promulgated by the United States Department of Housing and Urban Development (HUD) (compare *National Fair Housing Alliance v. Travelers Indemnity Co.* (D.D.C. 2017) 261 F.Supp.3d 20, 22 [applying *Inclusive Communities*'s "more stringent" test]; *Southwest Fair Housing*, *supra*, 17 F.4th at p. 961, fn. 6 [same]; *Lincoln*, *supra*, 920 F.3d at pp. 901-903 [same] with *Burbank Apartments*, *supra*, 474 Mass. at p. 126 [applying HUD regulations]; *Mhany Management, Inc. v. County of Nassau* (2d Cir. 2016) 819 F.3d 581, 617-620 [same]); (2) a Fair Housing Act plaintiff must allege that the policy at issue constitutes an "artificial, arbitrary, and unnecessary barrier[]" to housing as part of its prima facie case (see *Ellis v. City of Minneapolis* (8th Cir. 2017) 860 F.3d 1106, 1112 (*Ellis*) [so requiring]; *Khan v. City of Minneapolis* (8th Cir. 2019) 922 F.3d 872, 874 [same]); and (3) the Coalition's causation allegations satisfy the "robust causation" standard.

24

remains with the plaintiff at all times."'"]; *Wards Cove, supra,* 490 U.S. at p. 659 ["The burden of persuasion . . . remains with the disparate-impact plaintiff."].)  This is why "'the establishment of a *prima facie* case, by itself, is not enough to establish liability under the [Fair Housing Act].'"  (*Avenue 6E, supra,* 818 F.3d at p. 513; *Mt. Holly, supra,* 658 F.3d at p. 385; cf. *A.F. Arnold & Co. v. Pacific Professional Ins., Inc.* (1972) 27 Cal.App.3d 710, 715 [lack of justification is an affirmative defense to a tort; it is not an intermediary step in a mechanism shifting the burden of production].)  Thus, the Coalition—as the plaintiff—has always borne the burden of establishing that its gentrification-based, disparate impact claim is cognizable under the Fair Housing Act.  As explained above, *Inclusive Communities* dictates that the Coalition cannot carry that burden based on the gentrification theory it advances.

The Coalition responds that a plaintiff's ability to sufficiently allege a prima facie entitlement to relief is always enough to defeat a challenge to the pleadings in a disparate impact case because the last two steps of the burden-shifting rubric—namely, whether the impact is justified and is sufficiently tailored—may only be addressed in a subsequent motion for summary judgment.  More specifically, the Coalition asserts that *Inclusive Communities*'s safeguards are already accounted for in the three-step, burden-shifting mechanism and in the "robust causality" requirement of the plaintiff's "prima facie" case, and thus have no independent force.  For support, the Coalition cites *Sisemore, supra,* 151 Cal.App.4th at p. 1423, *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1167 (*Schnall*), and *De Reyes, supra,* 903 F.3d at pp. 430-432.  Thus,

25

the Coalition concludes, it should be permitted to proceed beyond the pleadings stage of its lawsuit.

We reject this argument on legal and factual grounds.

As a legal matter, *Inclusive Communities* forecloses allowing the Coalition's gentrification-based disparate impact claim to proceed any further. Although *Sisemore*, *Schnall*, and *De Reyes* suggest that the second and third steps of the burden-shifting rubric are typically to be litigated on a motion for summary judgment rather than on demurrer or a motion for judgment on the pleadings, *Inclusive Communities* dictates that we reject that approach here. As explained above, the Coalition's gentrification-based theory is not cognizable under the Fair Housing Act because that theory, by its very nature, is inconsistent with *Inclusive Communities*'s holding that the Fair Housing Act may not be used to inject race into land use decisions, to discourage the construction of affordable housing, or to perpetuate segregation. Allowing the case to move forward in order to allow for the discovery of additional *facts* cannot change the fundamental *legal* inconsistency between the Coalition's theory and the Fair Housing Act. As a result, judgment in favor of the City and the developer is preordained. This is true because the gentrification-based theory will be just as uncognizable on summary judgment as it is on the pleadings, *and* because the City and the developer will prevail on the last two steps of the burden-shifting rubric in any event: "[A]lleviating blight is a legitimate interest" (*Mt. Holly*, *supra*, 658 F.3d at p. 385), and the "safeguards" that *Inclusive Communities* pronounced and that dictate our conclusion that the gentrification theory falls outside the Fair Housing Act are to be considered in the third step of the burden-shifting rubric (*Southwest Fair Housing*, *supra*, 17 F.4th

at pp. 970-971) and dictate dismissal. Allowing the Coalition's Fair Housing Act claim to proceed while knowing to a certainty that it would be dismissed on summary judgment would undermine *Inclusive Communities*'s pronouncement that "prompt resolution of these cases is important." (*Inclusive Communities*, *supra*, 576 U.S. at p. 543; accord, *Ellis, supra*, 860 F.3d at p. 1111.) Although, as the Coalition points out, *Inclusive Communities* made its pronouncement about the need for prompt resolution" at the summary judgment stage of that case, the concerns animating the need for prompt resolution of a Fair Housing Act claim that is not cognizable apply with equal force at the pleading stage; otherwise, a defendant would have to incur the time and expense of extensive discovery and summary judgment litigation simply to obtain a dismissal to which it was entitled at the pleading stage.

As a factual matter, we may not focus solely on the first, prima facie case step because the Coalition has also made allegations in its operative pleading regarding the second and third steps that we cannot ignore. (Cf. *Schnall, supra*, 78 Cal.App.4th at p. 1167 ["since the complaint is unlikely to reveal defendant's justification—if [the] pleading states a prima facie case of harm . . . the defendant should be made to present its side of the story"].) Specifically, the Coalition alleged the City's and the developer's stated justification for the Project (namely, that it would "serve as a catalyst for economic development" and "contribute to the revitalization" of the area); alleged that this justification was "[n]ot legally sufficient"; and alleged that the justification could in any event "be served by other, properly enacted policies, practices and decisions that have a less discriminatory effect." Even if the Coalition had not made those

27

allegations expressly in its operative pleading, the City's and the developer's proffered justifications and the Coalition's responses to them were part of the public record that was judicially noticed by the trial court in adjudicating the motions below. (See Evid. Code, § 452; Code Civ. Proc., § 438, subd. (d).) Thus, the last two steps were at issue in this case and, for the reasons noted above, dictate dismissal of the Coalition's gentrification-based, disparate impact claim.

### C.   *FEHA Claim*

Among other things, FEHA makes it unlawful "to . . . make unavailable or deny a dwelling based on discrimination because of race, color," or several other protected characteristics. (Gov. Code, § 12955, subd. (k).) FEHA expressly extends its prohibitions to policies and practices that have a "discriminatory effect." (*Id.*, § 12955.8, subd. (b).) By borrowing language from the Fair Housing Act, FEHA was meant to provide "'"substantially equivalen[t]"'" protections to its federal counterpart. (*Konig v. Fair Employment & Housing Commission* (2002) 28 Cal.4th 743, 749.) But FEHA's protections are not *identical*: FEHA may not provide "*fewer* rights or remedies than the federal Fair Housing Act" supplies, yet FEHA is to be "construed liberally" and "may be construed to afford *greater* rights and remedies . . . than those afforded by federal law." (Gov. Code, §§ 12955.6, 12993, subd. (a), italics added; *Auburn Woods I Homeowners Assn. v. Fair Employment & Housing Comm.* (2004) 121 Cal.App.4th 1578, 1590-1591 (*Auburn Woods*), italics added.)

The Coalition argues that the dismissal of its Fair Housing Act claim is not dispositive of its FEHA claim because FEHA can afford broader relief. Of course, that FEHA *can* be construed to

28

be broader than the Fair Housing Act does not mean that it must *always* be construed to be broader or that it *inevitably must* be so construed in any particular case. Here, it must not. California courts "often look to cases construing the [Fair Housing Act] . . . when interpreting FEHA." (*Auburn Woods*, *supra*, 121 Cal.App.4th at p. 1591; *Sisemore*, *supra*, 151 Cal.App.4th at p. 1420.) *Inclusive Communities* is *the* critical case delimiting the scope of disparate impact claims under the Fair Housing Act, and thus is pertinent to the construction of FEHA. More to the point, the safeguards that *Inclusive Communities* built into disparate impact claims under the Fair Housing Act would seem to be equally pertinent to such claims under FEHA—namely, the concern that such claims not be used to coopt FEHA into a tool for injecting race into city planning decisions, for discouraging affordable housing, or for perpetuating racial segregation in housing patterns. (Accord, *Mahler v. Judicial Council of California* (2021) 67 Cal.App.5th 82, 113 [interpreting FEHA through the lens of *Inclusive Communities* and its concern about "'abusive disparate-impact claims'"].)

We therefore conclude that the Coalition's FEHA claim must be rejected for the same reasons as its Fair Housing Act claim.

## II.    CEQA Claim

The Coalition argues that the trial court erred in sustaining the demurrer to its CEQA claim on the grounds of untimeliness.

### A.    *CEQA and CEQA review, generally*

CEQA is designed "'to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions."'" (*Friends of College of San Mateo Gardens v.*

29

*San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944, quoting *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74.) CEQA operates, not by dictating proenvironmental outcomes, but rather by mandating that "decision makers and the public" study the likely environmental effects of contemplated government actions and thus make fully informed decisions regarding those actions. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447; Cal. Code Regs., tit. 14, § 15002, subd. (a)(1) [a "basic purpose[] of CEQA [is] to . . . [¶] . . . [i]nform governmental decision makers and the public about the potential, significant environmental effects of proposed activities."].)

Once a public agency has approved a project after considering the environmental effects of that project, CEQA allows for judicial review of the agency's compliance with CEQA. (Pub. Resources Code, § 21167.) But "[t]o ensure finality and predictability in public land use planning decisions," "CEQA provides unusually short statutes of limitations on filing court challenges to the approval of projects . . . ." (Cal. Code Regs., tit. 14, § 15112, subd. (a); *Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 499 (*Stockton*).)

As pertinent here, CEQA requires a party seeking to challenge a public agency's approval of a project due to alleged noncompliance with CEQA to file that challenge in court (1) within 30 days of when the agency posts a notice of determination, which must be posted within five days of the approval itself and must be publicly posted for a full 30 days; or (2) with 180 days of the public agency's "decision to carry out or approve the project." (Pub. Resources Code, §§ 21167, subds. (a), (b), (c) & (e), 21152, subds. (a) & (c); Cal. Code Regs., tit. 14, §

15112, subd. (c)(1) & (5); *Citizens for a Green San Mateo v. San Mateo County Community College* (2014) 226 Cal.App.4th 1572, 1589-1590; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 532.)

An untimely filed challenge is to be dismissed. (Cal. Code Regs., tit. 14, § 15112, subd. (b); *Stockton, supra*, 48 Cal.4th at p. 499.)

### B. *Analysis*

Because the Coalition first filed its CEQA challenge 558 days[9] after the Department of City Planning approved the vesting tentative tract map and certified the final environmental impact report for the Project, the timeliness of the Coalition's CEQA challenge boils down to whether the Department's actions on January 18, 2017, constituted a "decision to carry out or approve" the Project. We conclude that they did.[10]

For purposes of assessing the timeliness of a CEQA challenge, approval of a project "means the decision by a public agency which commits the agency to a definite course of action in regard to a project . . . ." (Cal. Code Regs., tit. 14, § 15352, subd. (a); *Stockton, supra*, 48 Cal.4th at pp. 505-506.) "With private projects" like the one in this case (that is, a project to be built by a private developer), "approval occurs upon [(1)] the earliest commitment to issue or [(2)] the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of

---

**9** There are 558 days between January 18, 2017, and July 30, 2018.

**10** Our decision to rely on the 180-day limitations period obviates any need for us to address the parties' arguments regarding the 30-day limitations period and the validity of the notice of determination posted by the Department.

31

financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Cal. Code. Regs., tit. 14, § 15352, subd. (b).) "No particular form of approval is required." (*Stockton*, *supra*, 48 Cal.4th at p. 506.)

Here, the Department's approval of the vesting tentative tract map constitutes an "approval" for purposes of CEQA because it constituted the "issuance by a public agency of a discretionary . . . entitlement for use of the Project." The Department was authorized to issue that approval (and to certify the final environmental impact report) because the City Council, consistent with the Municipal Code, had delegated that authority to the Department. (L.A. Muni. Code, §§ 17.03, 17.06.A.2; Pub. Resources Code, § 21151, subd. (c); Cal. Code Regs., tit. 14, §§ 15090, subd. (b), 15025; cf. *California Clean Energy Committee v. City of San Jose* (2013) 220 Cal.App.4th 1325, 1340 [delegation *not* sanctioned by local law is invalid].) Further, and as dictated by statute, the Department's approval of a vesting tentative tract map—whether conditional or unconditional—"confer[s] [upon the developer] a vested right to proceed with development in substantial compliance with the ordinances, policies, and standards" in effect at the time of approval. (Gov. Code, § 66498.1, subd. (b); *Kaufman & Broad Central Valley, Inc. v. City of Modesto* (1994) 25 Cal.App.4th 1577, 1586, 1588 [noting that this statute was "intended to create a vested right affording greater protection and arising earlier in the development process than the right available under the common law doctrine"].) This vested right enables "'[t]he private sector . . . to rely upon an approved vesting tentative [tract] map prior to expending resources and incurring liabilities without the risk of having the project frustrated by subsequent action by the approving [public]

agency . . . .'" (*Bright Development v. City of Tracy* (1993) 20 Cal.App.4th 783, 793, quoting Gov. Code, § 66498.9.)  Because it vests rights to proceed with the project in the private developer, the approval of a vesting tentative tract map constitutes an "entitlement for use of the project" that falls comfortably within the definition of "approval" for CEQA purposes.

C.    *The Coalition's arguments*

The Coalition makes what boils down to three categories of arguments in support of its position that the Department's approval of the vesting tentative tract map and its simultaneous certification of the final environmental impact report did not constitute an "approval" of the Project for CEQA purposes.

First, the Coalition argues that the Department's actions do not constitute an "approval" because, at that time, the City Council had yet to approve the City's development agreement with the developer and had yet to approve the height and zoning district changes necessary to implement the Project.  We reject this argument.  The Department's approval of the vesting tentative tract map granted the developer an entitlement to proceed with the Project.  That the *implementation* of the Project was contingent on further approvals outside the Department's purview to grant does not negate the entitlement conferred by the Department's approval of the vesting tentative tract map, and thus does not preclude the approval of the tract map from constituting an "approval" for purposes of CEQA.  (See *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 132-133 [CEQA "does not establish that a conditional agreement for development never constitutes approval of the development"].)  As our Supreme Court put it, the pertinent regulations "define [']approval' as occurring when the agency *first* exercises its

discretion to execute a contract or grant financial assistance [or take other actions committing it to a project], not when the *last* such discretionary decision is made." (*Id.* at p. 134, original italics.)

Second, the Coalition argues that a "project" is defined as "the whole of an action" (Cal. Code Regs., tit. 14, § 15378, subd. (a)); that a project thus cannot be approved until *all* of the necessary approvals are conferred and all administrative appeals have been exhausted; and that this degree of finality was not attained until the City Council enacted ordinances granting the height and zoning district changes, approved the development agreement, and denied all earlier administrative appeals. We reject this argument. It is specifically foreclosed by the CEQA regulations themselves: "The term 'project' refers to *the activity which is being approved* and which may be subject to several discretionary approvals by government agencies. The term 'project' *does not mean each separate governmental approval*." (Cal. Code Regs., tit. 14, § 15378, subd. (c), italics added; *Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 105.) Although, as the Coalition notes, courts have sometimes cited the definition of the term "project" to assess whether "approval" is required, they have done so in order to assess whether the underlying activity had sufficiently coalesced to be deemed a "project" that could be approved. (*Save Tara*, *supra*, 45 Cal.4th at pp. 134-135, 139.)

Lastly, the Coalition argues that the City should be equitably estopped from invoking the CEQA limitations period because it misled the public in the public notice announcing the Department's December 2016 meeting when the vesting tentative tract map was to be approved and the final environmental impact

34

report was to be certified. Specifically, the Coalition observes that the notice states that the Department *itself* was to consider these matters and, at the same time, states that "written comments" on those subjects "will be provided to the City Planning Commission" and that the final environmental impact report "will be submitted to the City Planning Commission and City Council for requested certification and action." According to the Coalition, the latter portions were misleading because they suggested that the Department was merely acting as a hearing officer for the Planning Commission and City Council rather than as a decision maker. We reject this argument for two reasons. To begin, although equitable estoppel may be invoked against public entities (*Citizens for a Responsible Caltrans Decision v. Department of Transportation* (2020) 46 Cal.App.5th 1103, 1128-1129 (*Caltrans Decision*)), its use is to be limited to "unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy" (*City of Goleta v. Superior Court* (2006) 40 Cal.4th 270, 279). Further, and more to the point, the notice does not satisfy the baseline standard for invoking estoppel—let alone the heightened showing necessary to invoke it against a public entity. The notice at issue is, at best, unclear and ambiguous about whether the Department was making final decisions or merely making recommendations to be passed up the food chain to the Planning Commission and City Council.[11] But it is well settled that "'*[c]ertainty* is essential to all

_____

11      And this is a generous reading because the notice is arguably not inaccurate or misleading *at all*. The notice did not say that the vesting tentative tract map would be submitted to the Planning Commission and City Council for action, and the Planning Commission and City Council did review the

35

estoppels'" and that it is not enough that a person makes a statement that is "'doubtful or matter of questionable inference.'" (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1318, quoting *Wheaton v. Insurance Co.* (1888) 76 Cal. 415, 429-430.) The Coalition points us to *Caltrans Decision*, but the agency in that case unambiguously stated it would be preparing an environmental impact report but instead turned around and filed a notice of exemption that obviated the need for any impact report.  (*Caltrans Decision*, at pp. 1133-1134.)

## DISPOSITION

The judgment is affirmed.  The City and the developer are entitled to their costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>.**


_____, J.
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ

---

Department's certification of the final environmental impact report to determine whether any supplemental environmental analysis was necessary (and both concluded that no such supplemental analysis was warranted).